UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
In the Matter of the Arbitration Between

KAILUAN (HONG KONG) INTERNATIONAL CO., LTD.,

                         Petitioner,                16 Civ. 2160 (PKC)

     -against-

                                                  MEMORANDUM
                                                  AND ORDER

SINO EAST MINERALS, LTD.,

                         Respondent.
---------------------------------------------------------------x

P. KEVIN CASTEL, U.S.D.J.:

           Kailuan (Hong Kong) International Co., Ltd. ("Kailuan") brings this petition to vacate an arbitration award (the "Final Award") issued in favor of Respondent Sino East Minerals, Ltd. ("Sino East"). Sino East opposes the petition. According to Kailuan, the arbitration panel (the "Tribunal") exceeded its authority by issuing an award that contradicts clear terms of the contract and impermissibly modifies others, while also deciding issues that were never presented to the Tribunal. For its part, Sino East argues that the petition should be denied because the Final Award was clearly within the scope of the Tribunal's authority.

BACKGROUND

           Kailuan and Sino East are both international commodity trading companies organized under the laws of Hong Kong. (Pet. ¶¶ 1-2.) Kailuan is in the business of buying commodities, including coal, and reselling them for importation into the domestic Chinese market. (Id. ¶ 1.) Sino East also buys coking coal from coal-producing countries and sells it in China. (Id. ¶ 2.) On November 19, 2013 Sino East and Kailuan entered into a contract (the

"Contract") whereby Sino East agreed to sell and deliver roughly 130,000 metric tons of coking coal to Kailuan.  (Lennon Decl. Ex. 2 § IV.)  The Contract included a New York choice of law provision and an arbitration clause.  (Id. §§ XVI-XVII)

The Contract required that the coal be loaded onto a ship in Norfolk, Virginia between November 25 and December 4, 2013 and then brought to China.  (Id. § IV)  However, the vessel did not arrive in port until the morning of December 2, 2013 and loading did not begin until December 8, 2013.  (Resp't Mem. Ex. A ¶ 57.)  The bill of lading was issued on December 11, 2013 and the ship departed for China on the same day.  (Id.)  Kailuan contacted Sino East on December 3, 2013 to inquire about the status of the vessel, and was informed that the vessel had reached the loading port on December 2, 2013.  (Id. ¶ 87.)  Later, when Kailuan requested another update on December 10, 2013, it was told that the vessel had sailed from port on December 11, 2013 and was estimated to arrive at the discharge port in China on February 8, 2013.  (Id. ¶ 88.)  Kailuan did not express any concern regarding the late loading of the Vessel at this time.  (Id. ¶¶ 87-95.)

In order to pay for the cargo, Kailuan opened a letter of credit with ICBC in Hong Kong on November 22, 2013 with an expiration date of February 12, 2014.  (Lennon Decl. ¶ 12.) The Contract directed Sino East to deliver particular shipping documents to the issuing bank for negotiation within thirty-eight days of the bill of lading date, (Lennon Decl. Ex. 2 § VIII), which worked out to be January 18, 2014.  The shipping documents were presented to China CITIC Bank in Hong Kong ("CITIC"), the letter of credit bank for Sino East's purchasing agent. (Resp't Mem. Ex. A ¶ 59.)  CITIC identified two discrepancies: one of the three original bills of lading was not endorsed and all three bills of lading incorrectly included a "shipped on deck" notation.  (Id.)  On January 14, 2014, Sino East informed Kailuan about these issues and asked

Kailuan to accept the discrepancies and amend the letter of credit, but Kailuan refused.  (Id. ¶ 60.)  Kailuan insisted that Sino East have the bill of lading amended to correct the discrepancies which Sino East agreed to do, while also informing Kailuan that this amendment would delay presentation of the shipping documents beyond the January 18, 2014 deadline.  (Id.)  In response, Kailuan apparently suggested that it would consider extending the presentation deadline by ten days.  (Id.)  However, Kailuan failed to respond to Sino East's written request of January 20, 2014 to extend the presentation deadline to allow for a later presentation date while staying within the validity period of Kailuan's letter of credit with ICBC which expired on February 12, 2014.  (Id. ¶ 62.).  CITIC received the amended shipping documents on January 27, 2014, but Kailuan never amended the deadline for presentation of the documents.  (Id.)

During this time, Kailuan was in the process of finding a buyer for the coal in China.  (Id. ¶ 58.)  Despite discussions with several potential buyers, Kailuan was unable to sell the coal at a favorable price.  (Id.)  Kailuan and Sino East met several times during this period, and while Kailuan did bring up the possibility of asserting a loss, even going so far as to send a Letter of Claim on January 24, 2014 seeking $12 per ton in damages due to falling coal prices, it never claimed a right to cancel the Contract.  (Id. ¶¶ 63-64.)

On January 28, 2014, Kailuan informed Sino East, through counsel, that it was terminating the Contract pursuant to the Termination Clause.  (Id. ¶ 65.)  On January 31, 2014, Sino East rejected this termination notice and demanded that Kailuan accept delivery of the coal, but on February 6, 2014, Kailuan refused and reaffirmed its position that the Contract was terminated.  (Id.)  The vessel arrived in China on February 8, 2014 and, in order to mitigate its damages, Sino East offloaded the cargo into a bonded warehouse, finally selling the coal on February 14, 2014.  (Id. ¶¶ 66-68.)

On May 20, 2014, Sino East filed a Request for Arbitration, (id. ¶ 3), seeking $1,699,379.22 in damages plus pre-award interest and $164,321.16 in attorneys' fees, arbitrators' fees, and other costs, (id. ¶ 69).  Three arbitrators were selected for the panel, hearings were held in New York on January 28 and 29, 2015, and briefing followed.  (Id. at 4-9.)  According to the Terms of Reference, signed by the parties prior to the arbitration, the ultimate issues to be determined by the Tribunal were "(a) whether or not Kailuan wrongfully terminated the Sales Contract . . . thus entitling Sino East to damages; and (b) whether Sino East failed to timely present conforming shipping documents . . . thus entitling Kailuan to lawfully terminate the Sales Contract."  (Resp't Mem. Ex. B § 6.)

As summarized in the Final Award, Sino East claimed that its failure to meet the December 4, 2013 loading date and the January 18, 2014 presentation deadline were not material breaches and thus did not entitle Kailuan to terminate the contract.  (Resp't Mem. Ex. A ¶ 72.)  Alternatively, Sino East argues that even if there was a material breach, time was not of the essence for either the loading or presentation deadlines.  (Id.)  According to Sino East, Kailuan only terminated the contract after it was unable to sell the coal at a favorable price during transit and Sino East should not be held responsible for Kailuan's "bad bet."  (Id.) (quoting Main Post-Hearing Br. 1).

For its part, Kailuan argued that it was common knowledge that the Chinese coal market falls during the Spring Festival, which, in 2014 fell during the period of January 31, 2014 to February 6, 2014, (Pet'r Mem. 2-3), that Sino East was aware of Kailuan's intention to sell the coal prior to the Spring Festival, (id. at 4), and that therefore time was of the essence with respect to the loading and presentation dates, (Resp't Mem. Ex. A ¶ 73).  Accordingly, Sino East's failure to meet both deadlines constituted material breaches and gave Kailuan the right to

terminate the Contract.  (Id.)  Further, Kailuan claims that it was under no obligation to

immediately notify Sino East of the breach after learning of the missed deadlines, nor was its

delay in exercising its termination rights wrongful.  (Pet'r Mem. 14-15.)  In support of its

position, Kailuan cites Clause XI – "any latitude, extension of time or other indulgence, which

either of the Parties may grant to the other Party, will not operate as a waiver of the rights of

such Party, nor will it preclude such Party from subsequently exercising all of its rights under

this Contract" – and Clause XVIII – "[a]ny failure, relaxation or concession by any of the Parties

in the exercise of its rights to insist upon performance of any of the obligations or to exercise any

rights hereunder, shall not be construed as a waiver or relinquishment of the future exercise of

such rights" – of the Contract.  (Resp't Mem. Ex. A ¶¶ 73, 104.)

On February 10, 2016 the Tribunal issued its Final Award in which it ordered

Kailuan to pay damages for its wrongful termination of the Contract.  (Id. at 38.)  The award

discusses the Contract in detail and concludes that that although the missed loading deadline was

a material breach, incapable of remedy, Kailuan waived any right to cancel the Contract on that

basis by failing to protest or exercise its termination rights in a timely manner.  As the Tribunal

explained, the December 3, 2013 notification from Sino East that the vessel had only just arrived

the day before "should have triggered Kailuan's immediate concern that loading might not be

concluded by the deadline of December 4, 2013."  (Id. ¶ 90.)  While the Final Award notes that

Sino East's failure to complete loading by December 4 "would have constituted a material

breach not capable of remedy," the Tribunal concluded that had Kailuan really been concerned

about this breach, Kailuan should have immediately notified Sino East of its concern or even

terminated the Contract at that point in time.  (Id. ¶ 92.)  The Tribunal found that Kailuan's lack

of protest about the late loading date indicated that it was not actually troubled about the missed

deadline but was "content to continue its speculation of trying to sell the cargo enroute on favorable terms." (Id. ¶¶ 92-96.) Instead, the Tribunal concluded, it was only after Kailuan failed to find a buyer for the coal that it decided to terminate the Contract. (See id. ¶¶ 117, 121, 131.) Ultimately, the Final Award explains that "commercial fairness and equity demand that Kailuan . . . suffer the consequences of both its failure to act in a timely fashion . . . as well as the failure of its commercial speculation, which it was unable to cure except through the late assertion of conflicting contract clauses." (Id. ¶ 100.)

       The Tribunal also determined that the discrepancies in the bill of lading originally presented by Sino East were not material breaches of the Contract such that Kailuan could have terminated the Contract on that basis. (See id. ¶ 113.) In the Tribunal's opinion, these discrepancies were the type of unforeseen circumstance that the Mutual Collaboration Clause, Clause XXIV, directed the parties to use their best efforts to achieve a mutually acceptable solution in the spirit of collaboration. (Id. ¶ 118.) In addition, the Tribunal found that Kailuan knew, as early as January 8, 2014, that it had no acceptable buyers for the coal. (Id. ¶ 117.) Therefore, the timeliness of the presentation of the shipping documents was no longer critical, especially considering that compliant documents were available by January 27, 2014, a date that was beyond the original presentation deadline by well before Kailuan's letter of credit expired on February 12, 2014. (Id.) Yet, Kailuan failed to reasonably accommodate Sino East's request to amend the presentation deadline. (Id. ¶ 121.) Ultimately, the Tribunal concluded that

> Kailuan terminated an otherwise valid contract rather than incur a loss of $12 per mt, which it could have avoided in the first instance by adhering to its stated trading model of avoiding the purchase of coal without having a buyer already in hand. Moreover, given its initial failure to cancel the Vessel outright at the time of arrival in Norfolk on December 2, 2013 and its subsequent failure to reserve its rights when it learned that the Vessel had departed Norfolk on December 13, 2014, the appreciation of the timeliness once again

became a Kailuan issue and not one to be placed upon Sino East. Accordingly, the consequences of Kailuan's fundamental and material commercial omissions and failures cannot be reasonably excused by this Tribunal.

(Id. ¶ 124.)

Kailuan filed this petition on March 23, 2016 seeking an order to vacate the Final Award pursuant to the Federal Arbitration Act (the "FAA"). 9 U.S.C. § 10. Sino East opposes the petition and asks that the Court award it attorneys' fees and costs incurred in defending this action. (Resp't Mem. 10-11.) As discussed below, Kailuan has offered the Court no valid basis to vacate the Final Award and thus, the petition to vacate is denied.

DISCUSSION

I.    Applicable Law.

Where an arbitration "involve[s] parties domiciled or having their principal place of business [outside the United States]," it is subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") as codified in 9 U.S.C. §§ 201–08. Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc., 126 F.3d 15, 19 (2d Cir. 1997) (internal quotations omitted). Where an arbitration is conducted in the United States, "the domestic provisions of the [Federal Arbitration Act ("FAA")] also apply, as is permitted by Articles V(1)(e) and V(2) of the New York Convention." Scandinavian Reins. Co. Ltd. v. Saint Paul Fire & Marine Ins. Co., 668 F.3d 60, 71 (2d Cir. 2012); see also Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 102 n.1 (2d Cir. 2006) ("[T]he FAA and the New York Convention work in tandem, and they have 'overlapping coverage' to the extent that they do not conflict.").

Kailuan and Sino East are Hong Kong corporations with their principal places of business in Hong Kong. The arbitration between Kailuan and Sino East occurred in the United

States.  The parties do not dispute that the FAA governs the petition to vacate the Final Award.

Accordingly, the Court will apply the domestic provisions of the FAA to the issues raised herein.

       a.   The Federal Arbitration Act.

"The court's function in confirming or vacating an arbitration award is severely

limited." Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp., 103 F.3d 9, 12

(2d Cir. 1997) (citation omitted).  "The arbitrator's rationale for an award need not be explained,

and the award should be confirmed if a ground for the arbitrator's decision can be inferred from

the facts of the case." D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006)

(internal quotations omitted).  Accordingly, a party seeking "to vacate an arbitration award has

the burden of proof, and the showing required to avoid confirmation is very high." Id.

The FAA provides "streamlined treatment" for a party seeking "a judicial decree

confirming an award, an order vacating it, or an order modifying or correcting it." Hall St.

Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 582 (2008).  Section 10(a) of the FAA "sets forth

specific grounds for vacating" an arbitration award.  Jock v. Sterling Jewelers Inc., 646 F.3d 113,

121 (2d Cir. 2011).  "Because the FAA supports a 'strong presumption in favor of enforcing

arbitration awards . . . the policy of the FAA requires that the award be enforced unless one of

those grounds is affirmatively shown to exist.'" Id. (quoting Wall St. Assocs., L.P. v. Becker

Paribas Inc., 27 F.3d 845, 849 (2d Cir. 1994)).  Among those grounds are where the arbitrators

"exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award

upon the subject matter was not made." 9 U.S.C. § 10(a)(4).  As a "judicial gloss" on section

10(a), the Second Circuit recognizes two additional bases for vacatur: where the award shows a

"manifest disregard" of the law or of the terms of the parties' agreement. Schwartz v. Merrill

Lynch & Co., Inc., 665 F.3d 444, 451–52 (2d Cir. 2011) (citations omitted).

b.  <u>Section 10(a)(4).</u>

Section 10(a)(4) of the FAA allows a court to vacate an award "where the arbitrators exceeded their powers." <u>ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co.</u>, 564 F.3d 81, 85 (2d Cir. 2009) (quoting 9 U.S.C. § 10(a)(4)).  The Second Circuit has "consistently accorded the narrowest of readings" to this provision.  <u>Id.</u> (quoting <u>Banco de Seguros del Estado v. Mut. Marine Office, Inc.</u>, 344 F.3d 255, 262 (2d Cir. 2003)).  In applying section 10(a)(4), the Court does "not consider 'whether the arbitrators correctly decided [the] issue.'"  <u>Id.</u> at 86 (quoting <u>Banco</u>, 344 F.3d at 262) (alteration in original).  "It is not enough . . . to show that the panel committed an error—or even a serious error" to vacate an award.  <u>Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.</u>, 559 U.S. 662, 671 (2010).  "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, a court's conviction that the arbitrator has committed serious error . . . does not suffice to overturn his decision." <u>ReliaStar</u>, 564 F.3d at 86 (internal quotation marks omitted).

c.  <u>Manifest Disregard of the Parties' Agreement.</u>

Although Section 10 of the FAA is generally considered to provide the exclusive grounds for vacatur, <u>see</u> <u>Hall St. Assocs., L.L.C.</u>, 552 U.S. at 584, the Second Circuit has nevertheless held that, as a judicial gloss on those specific grounds, an arbitrator's manifest disregard of the law or of the terms of the parties' agreement remains a valid ground for vacating arbitration awards," <u>Schwartz</u>, 665 F.3d at 451-52.  "We apply a notion of 'manifest disregard' to the terms of the agreement analogous to that employed in the context of manifest disregard of the law," <u>id.</u> (quoting <u>Yusuf Ahmed Alghanim & Sons, W.L.L.</u>, 126 F.3d at 25), and "[a] litigant seeking to vacate an arbitration award based on alleged manifest disregard of the law bears a 'heavy burden,'" <u>T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.</u>, 592 F.3d 329, 339 (2d Cir.

2010) (quoting Stolt–Nielsen S.A., 548 F.3d at 91). "[V]acatur for manifest disregard of a commercial contract is appropriate only if the arbitral award contradicts an express and unambiguous term of the contract or if the award so far departs from the terms of the agreement that it is not even arguably derived from the contract." Westerbeke Corp. v. Daihatsu Motor Co., Ltd., 304 F.3d 200, 222 (2d Cir. 2002). "[I]nterpretation of . . . contract terms is within the province of the arbitrator and will not be overruled simply because [a court] disagree[s] with that interpretation." Schwartz, 665 F.3d at 452 (quoting Yusuf Ahmed Alghanim & Sons, W.L.L., 126 F.3d at 25). "If the arbitrator has provided even a barely colorable justification for his or her interpretation of the contract, the award must stand." Westerbeke, 304 F.3d at 222.

II.    Kailuan's Petition to Vacate the Award.

As a threshold matter, Kailuan argues that the Tribunal exceeded its authority by deciding that Kailuan had waived its termination rights, an issue Kailuan claims was never submitted to the Tribunal. (Pet'r Reply 3.) In these situations, the focus of the court's inquiry is "whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, *not whether the arbitrators correctly decided that issue*." Jock, 646 F.3d at 122 (quoting DiRussa v. Dean Witter Reynolds Inc., 121 F.3d 818, 824 (2d Cir. 1997)) (emphasis in original). "Accordingly, an arbitrator may exceed her authority by . . . considering issues beyond those the parties have submitted for her consideration . . . ." Id. However, "[i]f the parties agreed to submit an issue for arbitration, [a court] will uphold a challenged award as long as the arbitrator offers a barely colorable justification for the outcome reached." ReliaStar, 564 F.3d at 86 (internal quotations omitted).

The ultimate issues to be decided by the Tribunal were agreed upon by the parties before the arbitration began. (Resp't Mem. Ex. B. § 6.) According to the Terms of Reference,

the two issues for the Tribunal were "(a) whether or not Kailuan wrongfully terminated the Sales

Contract . . . thus entitling Sino East to damages; and (b) whether Sino East failed to timely

present conforming shipping documents . . . thus entitling Kailuan to lawfully terminate the Sales

Contract." (Id.)  While it is true that an arbitrator may not rule on issues not presented to her by

the parties, see Fahnestock & Co., Inc. v. Waltman, 935 F.2d 512, 515 (2d Cir. 1991), the Terms

of Reference make clear that the Tribunal did not overstep its authority by deciding that Kailuan

failed to exercise its termination rights in a timely manner.  Not only do the Terms of Reference

specifically note that the list of ultimate issues to be decided is "non-exhaustive," (Resp't Mem.

Ex. B § 6), whether or not Kailuan adequately preserved its termination rights is critical to a

determination of the wrongfulness of Kailuan's ultimate termination.  Thus, the Tribunal did not

exceed its authority by reaching an issue that was not presented to it by the parties, and the award

will not be vacated on that ground.

   Next, Kailuan argues that "the Tribunal exceeded its authority by re-writing a

timing requirement into the termination clause" when it found that Kailuan's failure to protest or

immediately terminate the Contract after learning that the coal had not be loaded on time

operated as a waiver of its ability to later terminate the Contract.  (Pet'r Mem. 14.)  According to

Kailuan, the Contract did not require Kailuan "to provide Sino East with any prior notice before

terminating the Sales Contract due to [Sino East's] failure to meet the December 4 loading

deadline."  (Id. at 15.)  The Tribunal therefore impermissibly added terms to the Contract when it

concluded that such an obligation existed.  (Id.)

   Finally, Kailuan claims that the Final Award manifestly disregards the parties'

agreement by ignoring and contradicting the express and unambiguous terms of Clause XI and

Clause XVIII of the Contract.  (Id. at 14.)  Clause XI, the Default clause, reads:

In the event of either Party ("the defaulting Party") committing a breach of any of the provisions of this Contract, the Party not in breach ("the aggrieved Party") shall be entitled to give the defaulting Party notice in writing, registered mail, return receipt requested, to remedy the breach.

If the defaulting Party fails to comply with that notice within thirty (30) days of the date of posting thereof, the aggrieved Party, at its option, shall be entitled to claim specific performance or to terminate this Contract, without prejudice to the aggrieved Party's rights to claim damages.

Except for the Force Majeure any latitude, extension of time or other indulgence, which either of the Parties may grant to the other Party, will not operate as a waiver of the rights of such Party, nor will it preclude such Party from subsequently exercising all of its rights under this Contract.

(Lennon Decl. Ex. 2.)  Similarly, Clause XVIII, the Waiver and Notices clause, provides that:

Any failure, relaxation or concession by any of the Parties in the exercise of its rights to insist upon performance of any of the obligations or to exercise any rights hereunder, shall not be construed as a waiver or relinquishment of the future exercise of such rights and the obligations of that Party shall continue in full force and effect.

(Id.)  Kailuan effectively reads these two provisions to permit the aggrieved party to assert a default against the breaching party at *any* time, even in the absence of notice or other immediate action at the time of the actual breach.  (See Pet'r Mem. 14-15.)  Therefore, Kailuan argues, the Final Award contradicts the clear language of the Contract when it concludes that Kailuan waived its right to terminate the Contract based on the late loading of the coal.  (Id. at 14)

Kailuan has not demonstrated that the Tribunal exceeded its authority by finding that Kailuan failed to preserve its right to terminate the Contract.  In its Final Award, the Tribunal reviewed the parties' submissions, quoted the relevant provisions of the Contract, and

recited the facts giving rise to the arbitration.  (Resp't Mem. Ex. A.)  Instead of re-writing the Contract to include a notice provision, the Tribunal simply interpreted the Contract as a whole to prohibit Kailuan's behavior, a task that was squarely within the scope of the Tribunal's authority. (Id. at 25-27; Resp't Mem. Ex. B § 6.)  Particularly in light of the Mutual Collaboration Clause, the Tribunal concluded that Kailuan's reading of the contract was "fundamentally unfair in that [Kailuan's] . . . failure to exercise reasonable commercial due diligence . . . in the immediate aftermath of the Vessel's late arrival and contractually deficient departure date would not [have been] penalized and would, in effect, [have held] Sino East as a commercial hostage to the whims of the Chinese coal market."  (Resp't Mem. Ex. A ¶ 99.)  "[W]ithout any notice or reservation of rights at the time of the alleged breach, Kailuan would have been allowed to pursue the sale of the goods in transit without the possibility of either a contractual or a commercial penalty, should a suitable sale not have been subsequently found."  (Id. ¶ 98.)  This, the Tribunal found, would have unfairly granted Kailuan an option that it had not specifically bargained for.  (Id.)

Rather than ignore the terms of the Default and Waiver and Notices clauses, the Tribunal considered those provisions in detail and ultimately rejected Kailuan's interpretation for two reasons.  First, the Tribunal read the first paragraph of the Default clause, which provides that in the event of a breach, the aggrieved party "shall be entitled" to give notice to the defaulting party before terminating the contract, as a notice "requirement[]," (id. ¶ 103), rather than simply an option as was asserted by Kailuan, (Pet'r Mem. 15 n.6).  Second, the Tribunal found that notwithstanding some "apparently conflicting contract clauses," (Resp't Mem. Ex. A ¶ 100), "fundamental fairness required Kailuan to preserve its rights against Sino East in a timely manner," (id. ¶ 103).  The Tribunal explained that contract clauses "should not be construed in

isolation" and that taken as a whole, and informed by principles of commercial fairness and equity, the Contract did not support Kailuan's interpretation.  (Id. ¶¶ 97-105.)

Having reviewed the Contract and the Final Award, the Court concludes that the Tribunal did not intentionally ignore an express and unambiguous term of the parties' agreement or add new terms to the Contract.  "[I]t is not for the district court to decide whether the arbitrator 'got it right' when the question has been properly submitted to the arbitrator and neither the law nor the agreement categorically bar her from deciding that issue."  Jock, 646 F.3d at 124 (quoting ReliaStar, 564 F.3d at 85–86).  While Kailuan may disagree with the Tribunal's reading of the Contract, interpretation of contractual terms "is within the province of the arbitrator and will not be overruled simply because [a court] disagree[s] with that interpretation." Schwartz, 665 F.3d at 452 (quoting Yusuf Ahmed Alghanim & Sons, W.L.L., 126 F.3d at 25). The Final Award indicates that the Tribunal was "arguably construing or applying the contract" in finding that Kailuan failed to preserve its termination rights and wrongfully terminated the Contract.  ReliaStar, 564 F.3d at 86.  Therefore, the Final Award will not be vacated under section 10(a)(4) or the manifest disregard standard.

In sum, the Final Award recited the relevant terms of the Contract, considered the parties' submissions and actual behavior, and incorporated basic principles of contract interpretation and commercial fairness.  The Tribunal acted within the scope of its authority and explained its determination in detail in the Final Award.  Even if Kailuan's legal arguments were correct, it still has not directed the Court to an "egregious impropriety" by the Tribunal, T.Co Metals, 592 F.3d at 339, or shown that it ignored a clear and unambiguous term in the Contract. Rather, the Tribunal possessed the requisite "barely colorable justification" in finding that

Kailuan wrongfully terminated the Contract and awarding damages to Sino East.  ReliaStar, 564

F.3d at 86 (internal quotations omitted).  Accordingly, the Final Award will not be vacated.

      III.    Attorneys' Fees.

           Sino East's request for attorneys' fees and costs incurred in connection with

opposing Kailuan's motion to vacate the Final Award is denied.  "Under the prevailing American

rule, in a federal action, attorney's fees cannot be recovered by the successful party in the

absence of statutory authority for the award."  Int'l Chem. Workers Union (AFL–CIO), Local

No. 227 v. BASF Wyandotte Corp., 774 F.2d 43, 47 (2d Cir. 1985) (citing Alyeska Pipeline

Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975)).  Nevertheless, "a court may award

attorney's fees when the opposing counsel acts in bad faith, vexatiously, wantonly, or for

oppressive reasons."  Id. at 47 (internal quotation marks omitted).  Although the Court finds

Kailuan's arguments ultimately unpersuasive, Kailuan's actions in seeking vacatur of the

arbitration award were unmeritorious but not frivolous or vexatious.  Accordingly, the

application for an award of attorneys' fees is denied.

CONCLUSION

           For the reasons explained, the petition to vacate the award (Docket # 4) is

DENIED.  The clerk is directed to close the case.


           SO ORDERED.


                    P. Kevin Castel
                  United States District Judge

Dated:  New York, New York
       December 9, 2016